IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KIMBERLY B. SMITH, :

        Plaintiff, :

                              Case No. 3:04cv443

        vs. :

                        JUDGE WALTER HERBERT RICE

LEXIS NEXIS, et al., :

        Defendants. :

---

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #25); JUDGMENT TO BE ENTERED IN
FAVOR OF THE DEFENDANTS AND AGAINST PLAINTIFF;
TERMINATION ENTRY

---

Plaintiff Kimberly Smith ("Plaintiff" or "Smith"), an African-American, was
formerly employed by Defendant Lexis Nexis ("LN"). She brings this litigation
against LN and two of her former supervisors at her former place of employment,
Myriam Schmell ("Schmell") and Kevin Stehr ("Stehr"). In her Complaint
(Doc. #1), she alleges, inter alia, that she was discriminated against because of her
race and her sex and in retaliation for her having filed an internal complaint with
the human relations department of LN, all in violation of Title VII of the Civil Rights
Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and Chapter 4112 of the
Ohio Revised Code ("Chapter 4112").

The Plaintiff was hired by LN in 1994, as a Technical Customer Support Representative, where she provided assistance to customers over the telephone.[1] However, she wanted a sales position and aggressively pursued her opportunities for such a position both inside and outside of LN.  Nevertheless, Smith remained in her position as a Technical Customer Support Representative until 2002.

During the summer of 2002, LN decided to create two new positions at its newly acquired CourtLink division for 2003,[2] called SWAT Applications Consultant ("SWAT") positions.  The SWAT positions were established in order to fill the need created by the anticipated release of three new products by CourtLink in 2003.  An individual selected to fill a SWAT position would not be assigned a particular territory; rather, he or she would travel throughout the entire country in order to assist local sales teams implement and disseminate the new CourtLink products.  A SWAT employee was expected to increase product use and knowledge among LN's customers.  The two employees selected for the SWAT positions would be expected to move into an area quickly, focus on that goal and move on to their next assignments.[3]

───────────────

[1]Since this matter comes before the Court on the Defendants' Motion for Summary Judgment (Doc. #25), this Court sets forth the facts and circumstances underlying this litigation in the manner most favorable to the Plaintiff.

[2]CourtLink is an online research tool which allows customers to search the dockets and records of courts throughout the United States.  Such searches can provide practitioners insight into an entity's litigation history, which can be used both for litigation and for business development purposes.

[3]In her Memorandum in Opposition to Defendants' Motion for Summary Judgment, the Plaintiff explains that "[a]s new products were released in an area, the SWAT team member 'swatted' into that region for a short period of time, targeted new people who were not utilizing the CourtLink product or not using its new content, met with them, had them actually use the product, and then moved on to where

During the summer of 2002, Smith, whose career goal was to obtain a sales position, became aware of the new SWAT positions and applied for such by sending her resume to a fellow employee of LN, Lila Gyasi ("Gyasi"). Gyasi forwarded Smith's resume to Schmell, for whom she (Gyasi) had previously worked and to whom she had previously reported.[4] Gyasi provided a very positive recommendation on behalf of Smith to Schmell. In addition, the latter met with the Plaintiff on a number of occasions. Although she did not know whether the Plaintiff possessed the sales skills necessary to succeed in a SWAT position, Schmell hired her for one of those positions, in large measure based upon Gyasi's recommendation, Plaintiff's passion for and interest in sales and her experience in customer service, where she had been working with customers on a daily basis.[5] Plaintiff started that job on or about September 9, 2002. During the first few months, from September, 2002, until January, 2003, when the SWAT positions would be fully launched, Smith was assigned to LN's Small Law Team. In that position, rather than performing the duties which would be expected of her in a SWAT position, she traveled extensively and shadowed other sales representatives of LN, in order to learn more about the CourtLink products. As Smith explained, she was getting her "feet wet" (Smith Dep. at 42), because working with the Small Law Team assisted her in learning about CourtLink's products. At a meeting

_____

the next need or assignment was." Doc. #38 at 7-8.

[4]Schmell and Stehr were responsible for hiring the individuals who would fill the two SWAT positions.

[5]Plaintiff contends that Schmell created the SWAT position specifically for her. See Doc. #38 at 7 (citing Smith's Dep. at 39). Construing the evidence in her favor, the Court accepts that proposition.

- **3** -

conducted in New York during December, 2002, Smith was introduced to Stehr and told that she would report to both Stehr and Schmell.[6]  Thereafter, however, Smith reported primarily to Stehr, who acted as her day to day manager.

The other SWAT position was filled by Matthew Hauler ("Hauler"), who was hired by Stehr in December, 2002.[7]  Unlike Plaintiff, Hauler had occupied a sales position at LN since 2000, assigned to a specific territory.  In that capacity, Hauler had gained experience uncovering leads for sales by making cold calls and presentations to law firms, during which he promoted and sold LN's products.  Hauler's wife, who was also an employee of LN, informed Stehr that her husband was interested in a SWAT position.  Before he hired Hauler, Stehr spoke with Hauler's supervisor, who indicated that Hauler had strong sales skills.  Like Plaintiff, Hauler reported directly to Stehr.

As indicated, neither Plaintiff nor Hauler was assigned a particular geographic region in their SWAT positions.  Rather, both were responsible for covering the entire country.  Hauler worked out of his residence, located in Fairfax, Virginia, just outside Washington, D.C.  Plaintiff worked from her residence in the Dayton area.  Since Hauler worked with accounts in the Washington D.C. area, he was not required to travel as frequently as the Plaintiff.[8]  Indeed, as she had been

---

[6]Smith also met Mason White, Director of Product Development for CourtLink, at that time.

[7]Plaintiff contends that Hauler was the "less senior" person hired for a SWAT position.  See Doc. #38 at 10.  Smith has not, however, explained what is meant by "less senior" and to whom he was less senior.

[8]Plaintiff was told by Schmell in January, 2003, that, although she would not be assigned a specific territory, she would eventually be required to relocate and given the choice of Washington, D.C., New York or Chicago.  Although Smith selected

warned, Plaintiff was required to travel extensively.  The most important aspects of the SWAT positions included customer training, actual hours spent in customers' accounts scheduling, executing one to one appointments with customers on a weekly basis, filling in a weekly schedule through cold calls and by establishing close relationships and trust with CourtLink sales personnel in various geographic locations.  In addition, it was important that the SWAT employee's presentations focus on targeted high impact activities.

When he first observed the Plaintiff's performance as a SWAT employee, Stehr concluded that Plaintiff needed additional work on her basic sales skills; however, he also saw opportunities for improvement, given that she had been in that role for only a short period.  To assist in locating potential customers, Plaintiff was provided with training on Lexis.com, Martindale-Hubbell and on CLEAR, a program used to target prospective customers.  In addition, she was provided target lists, which included high-profile litigation targets, and the opportunity to shadow other sales employees.  Stehr also assisted Plaintiff and provided suggestions to her, so that she could improve her performance.  For instance, he gave her a training module called Personal Selling Skills, a book and tips on cold calling, step-by-step sales checklists and a bullet-point list of key ways to locate targets.[9]  Stehr also coached Plaintiff by telephone and with emails, emphasizing, inter alia, the importance of confidence and preparing an outline of points to be made during the initial telephone contact.

---

Washington, D.C., she did not move there or to either of the other cities mentioned by Schmell.

[9]Although not denying that Stehr provided her a book on cold calling tips, Plaintiff has argued that the book was not sufficiently helpful.  See Doc. #38 at 29.

In late February, 2003, Stehr traveled to Chicago in order to observe Smith on her account calls.[10]  Before that trip, Stehr stressed to Plaintiff the importance of scheduling five to six appointments each day.  When he arrived in Chicago, Smith was still in the process of developing her appointment schedule.  After that trip, Stehr sent Plaintiff a six-page memorandum, containing his observations and recommendations.  Plaintiff found very little in that document to be helpful and disagreed with his observations.  In addition, she concluded that Stehr was attempting to create a picture of her which suggested that she was not doing what was required, when she believed that she was.  Plaintiff also concluded that Stehr was not committed to her success.

In April, 2003, Plaintiff expressed interest in having a mentor.  Stehr concurred and suggested Hauler as a mentor, because he (Stehr) believed that Hauler had demonstrated the ability to perform the duties expected of him in a SWAT position.  Since Plaintiff did not want Hauler as her mentor, Andrea Isenberg ("Isenberg") was selected for that role.  As Plaintiff's mentor, Isenberg served as a resource to answer Smith's questions and to provide sales coaching.  Although Smith spoke with Isenberg on a number of occasions, Plaintiff did not believe that she had benefitted as a result.

During April of 2003, Schmell also went to Chicago to observe the Plaintiff and to accompany her on her account calls.[11]  Since Plaintiff had not scheduled her

---

[10]According to Smith, Stehr would talk to the customers when he accompanied her on account calls, and, then, criticize her for not doing her job.  Doc. #38 at 32.

[11]At some point, Plaintiff focused primarily on the Chicago market, which she contends was not a good market for LN's products.  Doc. #38 at 30-31.  Hauler, in contrast, was not required to work in that market.  Id. at 32.

appointments in advance, Schmell viewed the trip as a lost opportunity for Plaintiff to receive feedback and assistance in developing her skills from her manager.[12]

Stehr also spent two days with Plaintiff in Los Angeles near the end of April, shadowing her on account calls.  Once again, Stehr provided written feedback to the Plaintiff.[13]  In particular, he stressed the importance of scheduling in advance and explained that importance, with the example of his trip to Los Angeles, during which he and Smith had made only four visits over the two-day period, with the afternoon of both days being completely free.  In the written feedback, he also emphasized that she must to apply the training she had received about positioning, to probe customers about their knowledge of CourtLink's products and the needs of their practices, to promote CourtLink's exclusive products and to articulate to customers why those products are critical to those practices.  With each of those criticisms, Stehr provided concrete examples of Plaintiff's failure to incorporate those techniques into her presentations.

After Stehr's visit to Los Angeles in April, he placed Plaintiff on an AMP Plan in May, 2003.[14]  Stehr hoped that the AMP Plan would serve as a vehicle by which

---

[12]Mason White, Director of Product Development for CourtLink, was also asked to meet with Plaintiff in Chicago during April.  After that trip, White provided feedback to the Plaintiff, indicating that, although she was knowledgeable about CourtLink's products, that was not enough to succeed in sales.  He suggested that she plan out her schedule well in advance, that she set goals for her meetings with customers, rather than waiting for them to ask questions and that she focus on describing the specific value CourtLink's products could provide, rather than simply teaching them how use those products.

[13]Therein, Stehr complimented Smith on her knowledge of CourtLink's products and her customer skills, while telling her that those were not enough for her to succeed in a SWAT position.

[14]AMP is an acronym for Achieving Maximum Performance.

Plaintiff could improve her sales skills in a structured environment.  Plaintiff understood that the purpose of the Plan was to develop sales skills that Stehr believed she was lacking, although she did not believe that all provisions in the AMP Plan made sense from a business perspective.  Since Plaintiff was on the Plan, Stehr monitored Plaintiff and provided feedback to her on a daily basis.  While on the AMP Plan, Plaintiff frequently failed to meet expectations.  As a consequence, the Plan, which had initially been scheduled to last 60 days, was extended for another month.  In early September, 2003, Stehr told Plaintiff that she still lacked key sales skills.

During the month of September, 2003, CourtLink's management reacted to the changed competitive environment, and decided to eliminate the SWAT positions.  CourtLink's competitors had become more aggressive, which caused it to conclude that it needed to focus on specific territories in order to compete effectively.  The individuals occupying the SWAT positions, Plaintiff and Hauler, were not assigned particular territories.  Those positions would be replaced by two Applications Consultant ("AC") positions, which would differ from the SWAT positions, in that those occupying the AC positions would be assigned specific territories and revenue responsibility for those territories.[15]  Each of the two individuals filing the AC positions would have complete control over his or her territory, with additional accountability and responsibility for deciding where to focus his or her efforts.

At the end of September, 2003, Stehr informed both Plaintiff and Hauler that the SWAT positions they then occupied were going to be eliminated and

_____

[15]The SWAT and AC positions would be similar in that both were sales positions.

replaced by the newly created AC positions.  He also encouraged both of them to apply for the new positions.  Plaintiff applied for both AC positions, while Hauler sought only the position which encompassed his residence in the Washington, D.C., area.[16]

Schmell, along with Stehr, interviewed both Plaintiff and Hauler.  Schmell decided to offer Hauler the position for which he had interviewed and not to offer an AC position to the Plaintiff.  Schmell's decision to offer the position to Hauler was predicated upon her conclusion that he had demonstrated that he had the skills necessary to fill an AC position, including the ability to oversee high-level meetings.  Schmell also concluded that Hauler was qualified for an AC position, because of his ability to create litigation profiles as a sales technique to increase business.[17]  To create such a marketing tool, Hauler would use the CourtLink databases to obtain data concerning the litigation practices of a particular law firm's clients, i.e., the amount of litigation in which the client was involved and the portion of that litigation of which the law firm was aware and involved.  He would then show the information to the law firm, in an effort to demonstrate how CourtLink's products could be of benefit to the law firm.[18]

Schmell decided not to offer either of the AC positions to Smith, because she had failed to demonstrate that she had the qualifications and skills necessary to succeed in such a position and she had not met LN's expectations for someone

---

[16]Hauler did not want to relocate.

[17]Defendants refer to the litigation profiles as "fear sheets."

[18]Like Hauler, Plaintiff had been trained on how to create litigation profiles; however, she was unable to create such profiles.

in a SWAT position. For instance, despite the training and coaching she had received in her SWAT position, Plaintiff was not meeting expectations for her sales metrics on a weekly or monthly basis, her sales skills were less than expected and her presentation skills were ineffective.[19]

After learning that her SWAT position would be eliminated, Plaintiff contacted Michelle Pinsky ("Pinsky"), an employee in LN's Human Relations Department, to complain that she was not being treated fairly. Pinsky assured Plaintiff that she would investigate her complaint of unfair treatment. After Pinsky had informed Schmell and Stehr that Plaintiff had made such a complaint which was being investigated, Stehr told Plaintiff that the decisions concerning the two AC positions would be delayed as a result of her complaint. As a consequence, Plaintiff was told to continue performing the tasks of her SWAT position.

By letter under date of October 24, 2003, Pinsky told Plaintiff that, based upon her investigation, she (Pinsky) had determined that there was no evidence that she (Plaintiff) had been treated unfairly in violation of LN policy. At that time, Plaintiff was also informed that she had not been selected for one of the new AC positions and that she would remain on LN's payroll for 30 days, during which she could look for open positions at LN. Smith was also offered a severance package which she refused to accept.

One of the AC positions was filled by Hauler. In late December, 2003, the other position was filled by Elena Delaurenti ("Delaurenti"), who, when hired, did

_____

[19]Based upon Plaintiff's interview, Schmell rated Smith as less than acceptable on three of the seven criteria, acceptable on three of the seven criteria and more than acceptable on the seventh such. In contrast, Hauler was rated acceptable on three of the criteria and more than acceptable on the other four.

not have experience in a SWAT position.  Schmell selected Delaurenti, because she believed that Delaurenti possessed the requisite skills to perform the functions of the AC position successfully.  Delaurenti occupied that position for about one year, during which her performance was viewed positively.  Delaurenti was forced to resign that position, however, after her father died, in order to move back to her home in St. Louis.

In her Complaint (Doc. #1), the Plaintiff has set forth six claims for relief, to wit: 1) a claim of race discrimination in violation of Title VII (First Claim for Relief); 2) a claim of sex discrimination in violation of Title VII (Second Claim for Relief); 3) a claim of race discrimination in violation of Chapter 4112 (Third Claim for Relief); 4) a claim of sex discrimination in violation of Chapter 4112 (Fourth Claim for Relief); 5) a common law claim under the law of Ohio for discharge in violation of public policy (Fifth Claim for Relief); and 6) a claim of retaliation in violation of Chapter 4112 (Sixth Claim for Relief).

This case is now before the Court on the Defendants' Motion for Summary Judgment (Doc. #25).  The Plaintiff has opposed that motion (see Doc. #38), and the Defendants have filed a Reply Memorandum (Doc. #41).  The Court now rules on that motion, beginning its analysis by setting forth the procedural standards it must apply whenever it rules upon a motion for summary judgment.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Of course, the moving party:

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991)

(The moving party has the "burden of showing that the pleadings, depositions,

answers to interrogatories, admissions and affidavits in the record, construed

favorably to the nonmoving party, do not raise a genuine issue of material fact for

trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The

burden then shifts to the nonmoving party who "must set forth specific facts

showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the

moving party has met its initial burden, the nonmoving party must present

evidence that creates a genuine issue of material fact making it necessary to

resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d

1241, 1245 (6th Cir. 1995). Read together, Liberty Lobby and Celotex stand for

the proposition that a party may move for summary judgment by demonstrating

that the opposing party will not be able to produce sufficient evidence at trial to

withstand a directed verdict motion (now known as a motion for judgment as a

matter of law. Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472,

1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary

judgment cannot rest on its pleadings or merely reassert its previous allegations. It

is not sufficient to "simply show that there is some metaphysical doubt as to the

material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986). See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th

Cir. 1989), <u>cert</u>. <u>denied</u>, 494 U.S. 1091 (1990).  <u>See also</u> <u>L.S. Heath & Son, Inc.</u>

<u>v. AT&T Information Systems, Inc.</u>, 9 F.3d 561 (7th Cir. 1993); <u>Skotak v. Tenneco</u>

<u>Resins, Inc.</u>, 953 F.2d 909, 915 n. 7 (5th Cir.), <u>cert</u>. <u>denied</u>, 506 U.S. 832 (1992)

("Rule 56 does not impose upon the district court a duty to sift through the record

in search of evidence to support a party's opposition to summary judgment ...."].

Thus, a court is entitled to rely, in determining whether a genuine issue of material

fact exists on a particular issue, only upon those portions of the verified pleadings,

depositions, answers to interrogatories and admissions on file, together with any

affidavits submitted, specifically called to its attention by the parties.


The Defendants seek summary judgment on all six of the Plaintiff's claims.

As a means of analysis, the Court will address that motion as it relates to the

Plaintiff's claims in the order in which they appear in her Complaint (Doc. #1),

discussing the First through Fourth Claims for Relief together.


<u>I.  Claims of Race and Sex Discrimination (First through Fourth Claims for Relief)</u>

As a means of analysis, this Court will initially review the legal standards

which govern Plaintiff's claims of race and sex discrimination under Title VII and

Chapter 4112.

In <u>Laderach v. U-Haul of Northwestern Ohio</u>, 207 F.3d 825 (6th Cir. 2000),

the Sixth Circuit reiterated that, since the standards for establishing discrimination

under Title VII and Chapter 4112 are the same, "we need not analyze [plaintiff's]

discrimination claims separately under state and federal law."  <u>Id</u>. at 828 (citing

<u>Little Forest Medical Center of Akron v. Ohio Civil Rights Comm.</u>, 61 Ohio St.3d

607, 609-10, 575 N.E.2d 1164 (1991)).  See also, Plumbers & Steamfitters Joint

Apprenticeship Committee v. Ohio Civil Rights Comm., 66 Ohio St.2d 192, 421

N.E.2d 128 (1981) (holding that the standards used to analyze claims under Title

VII are applicable to claims under Chapter 4112); Mowery v. Columbus, 2006 WL

620902 (Ohio App. 2006) (same); Senu-Oke v. Bd. of Ed. of Dayton City Schools,

2005 WL 2403910 (Ohio App. 2005); Scott v. University of Toledo, 2000 WL

256183 (Ohio App. 2000) (same).  Accordingly, this Court will apply the federal

standards when ruling upon the Defendants' request for summary judgment on

Plaintiff's state law claims of both race discrimination and racial harassment.

In Hollins v. Atlantic Company, Inc., 188 F.3d 652 (6th Cir. 1999), the Sixth

Circuit reviewed the McDonnell Douglas/Burdine analytical framework which is

applicable in employment discrimination lawsuits:

> In a Title VII case, in the absence of direct evidence, the burden-shifting
> approach for inferential proof of discrimination set forth in Texas Department
> of Community Affairs v. Burdine, 450 U.S. 248 (1981), and McDonnell
> Douglas Corp. v. Green, 411 U.S. 792 (1973), applies.  Burns v. City of
> Columbus Dep't of Pub. Safety, 91 F.3d 836, 843 (6th Cir. 1996). .....
> We have described the familiar McDonnell Douglas analysis as
> follows:
> > (1) the plaintiff must establish a prima facie case of racial
> > discrimination; (2) the [defendant] must articulate some legitimate,
> > nondiscriminatory reason for its actions; and (3) the plaintiff must
> > prove that the stated reason was in fact pretextual.
> Harrison v. Metropolitan Gov't of Nashville and Davidson County, 80 F.3d
> 1107, 1115 (6th Cir. 1996).

Id. at 658.  It bears emphasis that the burden on the defendant at the second step

is merely one of production, with the ultimate burden of persuasion remaining upon

the plaintiff.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

Moreover, if the defendant meets its burden of production, the presumption of

discrimination, which the plaintiff creates by establishing a prima facie case, is

rebutted and, thus, "drops from the case." Id.

In Carter v. University of Toledo, 349 F.3d 269 (6th Cir. 2003), the Sixth

Circuit restated the elements of a prima facie case of discrimination:

> To establish a prima facie case of discrimination, a plaintiff must show
> that (1) she is a member of a protected group, (2) she was subject to an
> adverse employment decision, (3) she was qualified for the position, and (4)
> she was replaced by a person outside of the protected class. Kline v.
> Tennessee Valley Auth., 128 F.3d 337, 349 (6th Cir. 1997).

Id. at 273. See also, Newman v. Federal Express Corp., 266 F.3d 401, 406 (6th

Cir. 2001). However, in Minadeo v. ICI Paints, 398 F.3d 751 (6th Cir. 2005), the

Sixth Circuit explained the alternative method for establishing the fourth element of

a prima facie case of discrimination:

> The fourth element generally requires a showing that the plaintiff was
> replaced by a person outside the protected class.  However, we have held
> that, alternatively, the "fourth element may also be satisfied by showing that
> similarly situated non-protected employees were treated more favorably."
> Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir .2002) (quoting Talley v.
> Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995)).

Id. at 764.  Accord, Singfield v. Akron Metropolitan Housing Authority, 389 F.3d

555, (6th Cir. 2004).

In Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992), the Sixth

Circuit indicated that "to make a comparison of a discrimination plaintiff's

treatment to that of non-minority employees, the plaintiff must show that the

'comparables' are similarly situated in all respects." Id. at 583 (emphasis in the

original).  In Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir.

1998), the Sixth Circuit elaborated upon Mitchell:

We explained in Mitchell that when the plaintiff lacks direct evidence of discrimination, "the plaintiff must show that the 'comparables' are similarly-situated in all respects," absent other circumstantial or statistical evidence supporting an inference of discrimination. Id. at 583. Although this statement appears to invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment, Mitchell has not been so narrowly construed. In Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994), this court explained that the plaintiff was simply "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." Id. at 802 (emphasis added); see also Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing Mitchell in support of the proposition that "[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects" (emphasis added)); Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C.Cir. 1995) (quoting Pierce); Byrd v. Ronayne, 61 F.3d 1026, 1032 (1st Cir. 1995) ("A disparate treatment claimant bears the burden of proving that she was subjected to different treatment than persons similarly situated in all relevant aspects." (quotation omitted)). Mitchell itself only relied on those factors relevant to the factual context in which the Mitchell case arose--an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment. We held that to be deemed "similarly-situated" in the disciplinary context, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583. These factors generally are all relevant considerations in cases alleging differential disciplinary action. Cf. Pierce, 40 F.3d at 802 (explaining that the distinction in supervisory status between plaintiff and non-minority employee also accused of sexual harassment was relevant because company's liability under Title VII for sexual harassment could depend on employee's status). Courts should not assume, however, that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to

- 17 -

compare himself or herself must be similar in "all of the <u>relevant</u> aspects."
<u>Pierce</u>, 40 F.3d at 802 (emphasis added).

<u>Id</u>. at 352.  <u>Accord</u>, <u>Singfield</u>, 389 F.3d at 562.

In <u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078 (6th Cir.

1994), the Sixth Circuit discussed the methods by which a plaintiff can establish

pretext:

> To make a submissible case on the credibility of his employer's
> explanation, the plaintiff is "required to show by a preponderance of the
> evidence either (1) that the proffered reasons had no basis <u>in fact</u>, (2) that
> the proffered reasons did not <u>actually</u> motivate his discharge, or (3) that they
> were <u>insufficient</u> to motivate discharge."  <u>McNabola v. Chicago Transit</u>
> <u>Authority</u>, 10 F.3d 501, 513 (7th Cir. 1993) (emphasis added and quotation
> marks omitted).  The first type of showing is easily recognizable and consists
> of evidence that the proffered bases for the plaintiff's discharge never
> happened, i.e., that they are "factually false."  [<u>Anderson v.</u>] <u>Baxter</u>
> <u>Healthcare</u>, 13 F.3d [1120, 1123-24 (7th Cir. 1994)].  The third showing is
> also easily recognizable and, ordinarily, consists of evidence that other
> employees, particularly employees not in the protected class, were not fired
> even though they engaged in substantially identical conduct to that which
> the employer contends motivated its discharge of the plaintiff.  These two
> types of rebuttals are direct attacks on the credibility of the employer's
> proffered motivation for firing plaintiff and, if shown, provide an evidentiary
> basis for what the Supreme Court has termed "a suspicion of mendacity."
> <u>Hicks</u>, 509 U.S. at [511], 113 S.Ct. at 2749.  As <u>Hicks</u> teaches, such a
> showing permits, but does not require, the factfinder to infer illegal
> discrimination from the plaintiff's <u>prima</u> <u>facie</u> case.
> The second showing, however, is of an entirely different ilk.  There,
> the plaintiff admits the factual basis underlying the employer's proffered
> explanation and further admits that such conduct could motivate dismissal.
> The plaintiff's attack on the credibility of the proffered explanation is,
> instead, an indirect one.  In such cases, the plaintiff attempts to indict the
> credibility of his employer's explanation by showing circumstances which
> tend to prove that an illegal motivation was more likely than that offered by
> the defendant.  In other words, the plaintiff argues that the sheer weight of
> the circumstantial evidence of discrimination makes it "more likely than not"
> that the employer's explanation is a pretext or coverup.

Id. at 1084 (emphasis in the original).  Accord Anthony v. BTR Automotive Sealing

Systems, Inc., 339 F.3d 506 (6th Cir. 2003); Dews v. A.B. Dick Co., 231 F.3d

1016, 1021 (6th Cir. 2000); Kline v. Tennessee Valley Authority, 128 F.3d 337,

346-47 (6th Cir. 1997).


Defendants argue that they are entitled to summary judgment on Plaintiff's

claims of race and sex discrimination, because the evidence fails to raise a genuine

issue of material fact concerning all of the elements of her prima facie case of such

discrimination.  The Defendants argue further that, even if the evidence raises such

a genuine issue of material fact, they have met their burden of producing evidence,

articulating a nondiscriminatory reason for failing to select her for one of the AC

positions and terminating her employment, and the evidence does raise a genuine

issue of material fact on the question of pretext.  Not surprisingly, the Plaintiff

disagrees strongly.  See Doc. #38.  As a means of analysis, the Court will initially

address the parties' arguments concerning the elements of the Plaintiff's prima

facie case of race and sex discrimination, following which it will turn to the

question of pretext.


A.  Elements of Prima Facie Cases of Race and Sex Discrimination

Herein, the Defendants initially argue that the evidence fails to raise a

genuine issue of material fact as to whether the Plaintiff has established a prima

facie case of race or sex discrimination under federal or state law.  In support of

that argument, the Defendants present three propositions, some with subparts.  In

particular, the Defendants contend that the evidence does not raise genuine issues

of material fact as to her prima facie case with respect to her non-selection for an AC position, the termination of her employment or the different treatment of her vis a vis Hauler in the SWAT position. As a means of analysis, the Court will address the Defendants' arguments in the above order.

1.  Non-selection for AC Position

In support of this proposition, the Defendants initially argue that the evidence fails to raise a genuine issue of material on the third element of a prima facie case of race and/or sex discrimination, to wit: that she was qualified for the AC position. In particular, the Defendants contend that Plaintiff was not qualified for the position, because she did not possess the necessary sales experience or skills and was not meeting LN's legitimate expectations. For reasons which follow, this Court rejects Defendants' argument in that regard, without considering whether the evidence raises a genuine issue of material fact on that question, since it would be inappropriate to resolve that question at the prima facie stage of this litigation.

In Cline v. Catholic Diocese of Toledo, 206 F.3d 651 (6th Cir. 2000), the plaintiff alleged that the defendant had terminated her employment as a teacher because she had become pregnant. The defendant, on the other hand, argued that it had terminated her because she had engaged in premarital sex. The District Court concluded that the defendant was entitled to summary judgment, since the evidence did not raise a genuine issue of material fact as to whether she was qualified for her position (engaging in premarital sex had, in the eyes of the

defendant, rendered her morally unfit to continue to teach at its elementary

school).  Upon appeal, the Sixth Circuit reversed, writing:

> The [district] court found Cline "unqualified" under prong [three] of the prima facie case because she had not lived up to the promises she made to "exemplify the moral values taught by the Church."  J.A. at 332.  Because her pregnancy due to premarital sex meant that "she no longer met all the qualifications of her position," even strong evidence as to her satisfactory performance (i.e., her evaluations and teaching record) could not overcome these moral failings.  J.A. at 333.  This analysis improperly imported the later stages of the McDonnell Douglas inquiry into the initial prima facie stage.  As discussed infra, St. Paul alleges that it did not renew Cline's contract because she violated its premarital sex policy, which constituted part of the broader ministerial requirements of being a St. Paul teacher; conversely, Cline argues that this rebuttal is a pretext for discrimination.  Rather than resolve this debate at the prima facie stage, McDonnell Douglas requires that the district court consider this dispute at the inquiry's third stage, when its role is to decide the "ultimate question" of discrimination.  In other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.  The district court clearly failed to do this, improperly conflating the distinct stages of the McDonnell Douglas inquiry.

Id. at 660-61.  Accord Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 584-85

(6th Cir. 2002).  Similarly, herein, Defendants are conflating the prima facie and

subsequent stages of the case, by arguing that Plaintiff has not met LN's legitimate

expectations and did not have the requisite sales skills, given that they contend

Plaintiff was not selected for an AC position, as a result of those nondiscriminatory

reasons.  Moreover, construing the evidence in the manner most favorable to the

Plaintiff, the Court concludes that the Plaintiff had sufficient sales experience and

skills to be qualified for an AC position, given that she had been hired for a SWAT

position, which she had occupied for more than a year before the AC positions

were created and she was encouraged to apply for such a position.

Accordingly, the Court rejects Defendants' assertion that they are entitled to summary judgment on Plaintiff's claims of race and sex discrimination, because the evidence fails to raise a genuine issue of material fact on the third element of her prima facie case of such discrimination.

Alternatively, Defendants argue that the evidence does not raise a genuine issue of material fact on the fourth element of Plaintiff's prima facie case of race and sex discrimination.  The Defendants argue that to establish this element of her prima facie case, Plaintiff must demonstrate that the person outside the protected class who was hired was comparably qualified.  In support of that contention, Defendants rely upon White v. Columbus Metro. Housing Auth., 429 F.3d 232 (6th Cir. 2005).  Therein, the Sixth Circuit rejected the plaintiff's contention that it was improper to compare her qualifications with those of Robert Walker, the person ultimately selected for the position which she had sought, when deciding whether the evidence raised a genuine issue of material fact on the fourth element of her prima facie case, writing:

> Under Nguyen [v. City of Cleveland, 229 F.3d 559 (6th Cir. 2000)], it is insufficient for a plaintiff in a failure to promote sex discrimination case merely to point to a man who received the job in satisfying the fourth prong. Further, White's assertion that she satisfies her prima facie burden because she is similarly situated to Walker by virtue of the fact that they applied for the same position and their applications were reviewed by the same committee fundamentally misconceives the concept of the fourth prong of the prima facie requirement.  We hold that in order to satisfy the fourth prong of the prima facie burden in a failure to promote case, it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications.  See Williams v. Columbus Metro. Hous. Auth., 90 Fed. Appx. 870, 873 (6th Cir. 2004); Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003); Nguyen, 229 F.3d at 562-63.
>
> In holding that such a comparison is necessary in order for White to meet her prima facie burden, we are mindful of the fact that prior Sixth

Circuit case law warns against conflating the first (prima facie case) and second (articulation of a legitimate non-discriminatory reason) steps in the McDonnell-Douglas analysis.  See Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 584-85 (6th Cir. 2002); Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000).  White contends that this precedent precludes this court from engaging in a comparison of her qualifications with those of Walker, because she argues that doing so would be considering CMHA's proffered legitimate non-discriminatory reason at the first rather than the second step of the McDonnell Douglas framework in violation of this principle.  However, the case law indicates that courts engage in impermissible consideration of the defendant's proffered legitimate non-discriminatory reason during the first step of the McDonnell Douglas analysis when they cite the defendant's proffered reason in finding that the plaintiff is not qualified for the position and thus has failed to meet the second prong of the prima facie analysis.  In considering whether a plaintiff is qualified and thus meets the [third] prong of her prima facie burden, the case law is clear that "[a] court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge … [and] be careful not to conflate the distinct stages of the McDonnell Douglas test."  Cicero, 280 F.3d at 585 (citing Cline, 206 F.3d at 660-61).

The Cicero/Cline directive regarding the court's considerations of the plaintiff's qualifications in connection with the [third] prong of the prima facie burden does not preclude this court from examining the qualifications of both Walker and White in determining whether White has satisfied the fourth prong of her prima facie case.  Just as the case law directs us to conduct a review of the plaintiff's qualifications independent of the employer's proffered non-discriminatory reason in considering the [third] prong, the case law is equally clear that, in order to satisfy the fourth prong of her prima facie burden, the plaintiff must show that the position went to a person outside the protected class with similar qualifications.  See, e.g., Nyuyen, 229 F.3d at 562.

Id. at 241-43 (footnotes omitted).

According to Defendants, the evidence fails to raise a genuine issue of material fact as to whether the two individuals hired to fill the AC position, Delaurenti and Hauler,[20] had similar qualifications to Plaintiff.  This Court agrees.

---

[20]Given that Delaurenti is a female and, thus, not outside the protected class for the purposes of Plaintiff's sex discrimination claims, she would not establish a

The evidence establishes that Hauler had superior qualifications than Plaintiff.  For instance, unlike Plaintiff, he had demonstrated the ability to utilize litigation profiles in order to demonstrate to customers and potential customers the value of CourtLink's products and, thus, to increase business.  Moreover, Hauler had filled an AC position for two years prior to being selected to fill one of the SWAT positions, unlike the Plaintiff who had no prior sales experience.  In addition, Schmell and Stehr gave much more favorable ratings to Hauler than they had to Smith.  As to Delaurenti, there is simply no evidence in the record, indicating that Plaintiff possessed similar qualifications to her, in other words, that Delaurenti and Plaintiff were similarly situated in all relevant respects.

Accordingly, the Court concludes that the evidence fails to raise a genuine issue of material fact on the fourth element of Plaintiff's prima facie case of race and sex discrimination, in violation of Title VII and Chapter 4112, arising out of the Defendants decision to select Hauler and Delaurenti, rather than Smith, for the newly created AC positions.  Therefore, Defendants are entitled to summary judgment on the aspect of the First through Fourth Claims for Relief in Plaintiff's Complaint (Doc. #1), arising out of her non-selection for an AC position.

2.  Termination

Defendants argue that they are entitled to summary judgment on Plaintiff's claims of race and sex discrimination, predicated upon the theory that she was the victim of such discrimination as a result of her employment being terminated when

---

prima facie case of sex discrimination, even if she demonstrated that the two are comparably qualified.

her SWAT position was eliminated and she was not selected for one of the AC positions.  In particular, they contend that the evidence does not raise a genuine issue of material fact on the element of her prima facie case that she was replaced by someone outside the protected class or was treated less favorably than a similarly situated employee outside the protected class.  This Court agrees.  Since the SWAT position which Plaintiff had occupied was eliminated, she was not replaced by someone outside the protected class.  In addition, based upon the above reasoning, this Court concludes that the evidence fails to raise a genuine issue of material fact as to whether Hauler and/or Delaurenti were treated more favorably.

Accordingly, the Court concludes that the evidence fails to raise a genuine issue of material fact on the fourth element of Plaintiff's prima facie case of race and sex discrimination, in violation of Title VII and Chapter 4112, arising out of the termination of her employment.  Therefore, Defendants are entitled to summary judgment on the aspect of the First through Fourth Claims for Relief in Plaintiff's Complaint (Doc. #1), arising out of the termination of her employment.

3.  Different Treatment in SWAT Position

In her Complaint, Plaintiff alleges that she was discriminated against on the basis of her race and sex, in violation of both Title VII and Chapter 4112, by being treated differently and less favorably than Hauler, while they occupied the two SWAT positions.  See Doc. #1 at ¶¶ 71, 75, 80, 89 and 95.  In her Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiff has elaborated upon those allegations, identifying these claims in the following manner,

to wit: 1) Hauler was not required to travel constantly Monday through Friday;

2) Hauler was permitted to work from his home, following up on telephone calls

that had been made previously by Stehr and/or Schmell; 3) Hauler was granted

special travel assignments, which permitted him to go to certain locations for

personal reasons; 4) Hauler was not held to his weekly assignments, when his

travel schedule was impeded by snowstorms and hurricanes; 5) Hauler was

permitted to make group presentations, with the number of individuals in the

groups being counted toward his weekly numbers requirement;[21] and 6) Hauler was

given special projects to work on, during which he was exempt from meeting with

customers.  See Doc. #38 at 16-17.  Plaintiff supports these assertions solely with

her own deposition testimony, during which she testified that Hauler had told her

all of those things.[22]  Id at 16.  In her opposing memorandum, Plaintiff has

---

[21]In their SWAT positions, both Hauler and Smith were required, inter alia, to meet with 30 people per week.  According to Plaintiff, Hauler was permitted to meet that requirement by making group presentations, which Stehr prevented her from doing.

[22]One could certainly argue that Plaintiff's deposition testimony concerning Hauler's statements to her is inadmissable hearsay, which this Court cannot consider when ruling on the instant motion.  Plaintiff has offered Hauler's out of court statements for the truth of the matters set forth therein.  See Fed. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Moreover, it is questionable whether Hauler's statements to Plaintiff would qualify as statements "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," and, thus, non-hearsay.  See Fed. R. Evid. 801(d)(2)(D).  However, since the Defendants have not raised the issue, this Court does not resolve this aspect of Plaintiff's claims of race and sex discrimination on this basis.  See Greenlaw v. United States, — U.S. —, 126 S.Ct. 2559 (2008) (in the context of holding that a federal appellate court lacked the authority to increase a defendant's sentence in the absence of an appeal or cross-appeal by the

identified a number of other incidents in which she was treated less favorably than Hauler, to wit:[23] Hauler and his wife, another employee of LN, were provided a DSL internet connection, while Smith was not (id. at 22); Hauler used a CourtLink costumer's identification to sign on to the CourtLink computer, while Stehr admonished Plaintiff for doing the same thing (id.); Hauler was permitted to make sales calls by telephone, while Plaintiff was not (id. at 22-23); unlike Hauler, Smith was questioned by Stehr and Schmell about using points she had accumulated through work related travel to pay for a hotel while she was on vacation (id. at 26-27).

The Defendants seek summary judgment on these aspects of Plaintiff's race and sex discrimination claims, arguing, inter alia, that the evidence fails to raise a genuine issue of material fact on the question of whether any of these actions constituted an adverse employment action and that, therefore, the evidence fails to raise a genuine issue of material fact on her prima facie case of such discrimination. In Tepper v. Potter, 505 F.3d 508 (6th Cir. 2007), the Sixth Circuit restated the definition of the second element of a claim of discrimination under Title VII, that the plaintiff suffered an adverse employment action:

> The second prong looks at whether the employee experienced a "materially adverse" employment action. Ford v. Gen. Motors Co., 305 F.3d 545, 553 (6th Cir. 2002); Allen v. Michigan Dep't of Corr., 165 F.3d 405, 410 (6th Cir. 1999). A materially adverse employment action is
> a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

---

Government, stressing the importance of the adversary system, where counsel present the issues to be resolved).

[23]These assertions are not based solely upon Plaintiff's deposition testimony.

> _Burlington Indus. v. Ellerth_, 524 U.S. 742, 761 (1998).  Such a
> change "must be more disruptive than a mere inconvenience or an
> alteration of job responsibilities.  A materially adverse change might be
> indicated by a termination of employment, a demotion evidenced by a
> decrease in wage or salary, a less distinguished title, a material loss of
> benefits, significantly diminished material responsibilities, or other
> indices that might be unique to a particular situation."
> _Ford_, 305 F.3d at 553 (quoting _Hollins v. Atlantic Co._, 188 F.3d 652, 662
> (6th Cir. 1999)).

_Id_. at 515 (footnote omitted).  In the omitted footnote, the _Tepper_ court explained

that the Supreme Court's decision in _Burlington Northern & Santa Fe Ry. Co._, 548

U.S. 53 (2006), expanding the definition of "adverse employment action" for the

purposes of a claim under anti-retaliation provision of Title VII, was not applicable

to claims of discrimination under that statute.  _Id_. at 515 n. 1.  The Sixth Circuit

"has consistently held that _de minimis_ employment actions are not materially

adverse and, thus, not actionable."  _Ford v. Gen. Motors Co._, 305 F.3d 545, 553

(6th Cir. 2002).

Herein, the more favorable treatment, which Plaintiff contends that Hauler

was afforded and she was denied, does not constitute materially adverse

employment actions as that phrase has been defined by the Sixth Circuit.  Smith

did not, as a result of the more favorable treatment allegedly given to Hauler, suffer

a change in her employment, of the type identified by the Sixth Circuit in _Tepper_.

Therefore, this Court concludes that the evidence fails to raise a genuine issue of

material fact on the second prong of the prima facie case of her claims of race and

sex discrimination arising out of her being treated differently while she and Hauler

filled the two SWAT positions.  Accordingly, the Defendants are entitled to

summary judgment on the aspect of the Plaintiff's First through Fourth Claims for

Relief, arising out of the different treatment of her vis a vis Hauler in the SWAT position.

B.  Pretext

The Court's conclusions above that the evidence fails to raise genuine issues of material fact on all elements of the prima facie cases of sex and race discrimination relating to the three aspects Plaintiff's First through Fourth Claims for Relief (i.e., her non-selection for an AC position, the termination of her employment and the different treatment of her vis a vis Hauler in the SWAT position) renders it unnecessary to address the issue of pretext.  Nevertheless, in order to ensure a complete record, the Court rules on the Defendants' request for summary judgment as it relates to pretext.

It is unquestioned that Defendants have met the burden of articulating non-discriminatory reasons for not selecting Plaintiff for one of the AC positions, she had failed to meet expectations while occupying a SWAT position, and terminating her employment, the SWAT position she had occupied had been eliminated. Defendants argue that, even if the evidence raises a genuine issue of material fact on those aspects of the Plaintiff's First through Fourth Claims for Relief, they are nevertheless entitled to summary judgment, because the evidence does not raise a genuine issue of material fact concerning pretext.  The Plaintiff, in contrast, argues that the Defendants' reasons for not selecting her for one of the AC positions were a pretext for discrimination, because those positions were nothing more than the SWAT positions in disguise.  See Doc. #38 at 40.  In support of that proposition, Plaintiff points to the similarities between the AC and SWAT positions.  Id.

- 29 -

Although this Court agrees with the Plaintiff that the positions were similar, it

cannot agree with her that the evidence of such a similarity raises a genuine issue

of material fact on the question of whether not selecting her for one of the AC

positions was a pretext for discrimination.  For instance, the person chosen to

occupy an AC position would be assigned to a single territory, over which he or

she would have great responsibility.  In contrast, a person placed in one of the

SWAT positions was not assigned a specific territory.  In addition, the

uncontroverted evidence is that LN's management decided to replace the SWAT

positions with AC positions in order to meet competitive challenges CourtLink was

facing.  Moreover, there is no evidence that the AC position would constitute one,

as the Plaintiff has defined the SWAT positions in her Memorandum in Opposition

to Defendants' Motion for Summary Judgment, that "[a]s new products were

released in an area, the SWAT team member 'swatted' into that region for a short

period of time, targeted new people who were not utilizing the CourtLink product

or not using its new content, met with them, had them actually use the product,

and then moved on to where the next need or assignment was."  Doc. #38 at 7-8.

     In addition, Plaintiff challenges the factual accuracy of some of the alleged

shortcomings of her performance, upon which Stehr and Schmell based their

conclusion that she should not be offered one of the AC positions.  If Plaintiff is, as

a result, attempting to raise a genuine issue of material fact on the question of

pretext, because the reason for not selecting her was factually false, this Court

does not agree.  In <u>Braithwaite v. Timken Co.</u>, 258 F.3d 488, 493-94 (6th Cir.

2001), the Sixth Circuit discussed the burden upon a discrimination plaintiff to

show that the evidence raises a genuine issue of material fact on pretext, when he

or she challenges the factual support for the defendant's decision:

> Accordingly, the plaintiff must allege more than a dispute over the facts
> upon which his discharge was based.  He must put forth evidence which
> demonstrates that the employer did not "honestly believe" in the proffered
> non-discriminatory reason for its adverse employment action.  See Smith v.
> Chrysler, 155 F.3d 799, 806-07 (6th Cir. 1998) (citing Fischbach v. District
> of Columbia Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)
> ("[I]f the employer made an error too obvious to be unintentional, perhaps it
> had an unlawful motive for doing so.")).
>
> In order to determine whether the defendant had an "honest belief" in
> the proffered basis for the adverse employment action, this Court looks to
> whether the employer can establish its "reasonable reliance" on the
> particularized facts that were before it at the time the decision was made.
> See Smith, 155 F.3d at 807.  In Smith v. Chrysler, this Court provided some
> guidance in determining whether reasonable reliance was present. We
> stated:
>
> > In deciding whether an employer reasonably relied on the
> > particularized facts then before it, we do not require that the
> > decisional process used by the employer be optimal or that it left no
> > stone unturned.  Rather, the key inquiry is whether the employer made
> > a reasonably informed and considered decision before taking an
> > adverse employment action.
>
> Id.
>
> If there is no material dispute that the employer made a "reasonably
> informed and considered decision" that demonstrates an "honest belief" in
> the proffered reason for the adverse employment action, the case should be
> dismissed since no reasonable juror could find that the employer's adverse
> employment action was pretextual.

Id. at 493-94.  Accord Abdulnour v. Campbell Soup Supply Co., LLC, 502 F.3d

496, 502 (6th Cir. 2007).

Herein, like the plaintiff in Braithwaite, the Plaintiff has not provided

evidence which would indicate that the Defendants did not honestly believe that

Plaintiff had failed to demonstrate that she had the qualifications and skills

necessary to succeed in an AC position.

Accordingly, the Court concludes that the evidence fails to raise a genuine issue of material fact as to whether the stated reasons for not selecting Plaintiff for one of the AC positions was a pretext for discrimination.[24]

Based upon the foregoing, the Court sustains the Defendants' Motion for Summary Judgment (Doc. #25), as it relates to the First through Fourth Claims for Relief in Plaintiff's Complaint (Doc. #1).

II.  Discharge in Violation of Public Policy (Fifth Claim for Relief)

In the Fifth Claim for Relief in her Complaint (Doc. #1), the Plaintiff has set forth a claim under the common law of Ohio for discharge in violation of the public policy embodied by Chapter 4112.  The Defendants have moved for summary judgment, arguing that such a claim is precluded by the decision of the Ohio Supreme Court in Wiles v. Medina Auto Parts, 96 Ohio St.3d 240, 773 N.E.2d 526

_____

[24]Plaintiff also points to complaints of discrimination lodged against Schmell by two former LN employees.  See Doc. #38 at 46.  One of those individuals, Tiffany Bloom, a Caucasian female, complained to LN's Human Resources Department that Schmell had discriminated against her (Bloom) on the basis of her religion.  The other is Michael Gosling, a Caucasian male, who complained LN's Human Resources Department that Schmell had discriminated against him on the basis of his age.  Both complaints were found to have no merit.  Although she does not expressly so argue, Plaintiff may be of the opinion that these complaints constitute circumstantial evidence of discrimination, under the second prong of Manzer, supra.  This Court would reject such an argument, since allegations that Schmell has discriminated against a white female on the basis of her religion or a white male on the basis of his age is not circumstantial evidence that she discriminated against Plaintiff, an African-American female, on the basis of her race and sex.  On the contrary, they merely raise an inference that, if Schmell discriminated against employees, she did so on an equal opportunity basis, without regard to sex, race, religion or age.

(2002) (holding that the availability of a claim for monetary damages under the Family Medical Leave Act precluded the plaintiff from bringing a wrongful discharge claim in violation of the public policy embodied by that statute).[25]  See Doc. #25 at 34.  The Plaintiff essentially agrees that a claim for wrongful discharge in violation of the public embodied in Chapter 4112 does not exist.  See Doc. #38 at 2 n. 1. Accordingly, the Court sustains the Defendants' Motion for Summary Judgment

_____

[25]See also Leininger v. Pioneer Natl. Latex, 115 Ohio St.3d 311, 875 N.E.2d 36 (2007) (holding that availability of claims for monetary damages under state and federal statutes for age discrimination precludes claim for discharge in violation of the public policy embodied by those statutes); Carrasco v. NOAMTC, Inc., 2004 WL 2756838 (6th Cir.  2004) (affirming dismissal of plaintiff's claim for wrongful discharge in violation of the public policy embodied in Chapter 4112 and Title VII, because the remedies available under those statutes adequately protected society's interests); Lewis v. Fairview Hospital, 156 Ohio App.3d 387, 806 N.E.2d 185 (2004) (refusing to recognize a wrongful discharge claim on the basis of race discrimination in violation of the public policy established by Chapter 4112, because of the adequacy of the remedy established by that statute); James v. Delphi Auto. Sys., 2004 WL 2307825, (Ohio App. 2004) (refusing to recognize a wrongful discharge claim on the basis of race and sex discrimination in violation of the public policy established by Chapter 4112, because of the adequacy of the remedy established by that statute); Barlowe v. AAAA International Driving School, Inc., 2003 WL 22429543 (Ohio App. 2003) (refusing to recognize a wrongful discharge claim on the basis of disability discrimination in violation of the public policy established by Chapter 4112, because of the adequacy of the remedy established by that statute); Storm v. The Sabre Group, 2005 WL 1917357 (S.D.Ohio) (refusing to recognize a wrongful discharge claim on the basis of sex discrimination in violation of the public policy established by Chapter 4112 and Title VII, because of the adequacy of the remedy established by those statutes); Thaman v. Ohiohealth Corp., 2005 WL 1532550 (S.D.Ohio 2005) (same); Satterwhite v. Faurecia Exhaust Systems, Inc., 2005 WL 1279253 (S.D.Ohio 2005) (refusing to recognize a wrongful discharge claim on the basis of race discrimination in violation of the public policy established by Chapter 4112 and Title VII, because of the adequacy of the remedy established by those statutes); Williams v. Allstate Ins. Co., 2005 WL 1315756 (N.D.Ohio 2005) (refusing to recognize a wrongful discharge claim on the basis of age discrimination in violation of the public policy established by Chapter 4112, because of the adequacy of the remedy established by that statute).

(Doc. #25), as it relates to Plaintiff's claim for wrongful discharge in violation of public policy, the Fifth Claim for Relief in her Complaint (Doc. #1).

III.  Retaliation (Sixth Claim for Relief)

In her Complaint, the Plaintiff alleges that she was retaliated against, in violation of Chapter 4112 of the Ohio Revised Code, by not being selected for one of the AC positions, after she had filed the internal complaint with Pinsky, charging unfair treatment flowing from the decision to eliminate her SWAT position.  See Doc. #1 at ¶¶ 104-111.  In addressing the Defendants' arguments in support of their request for summary judgment on this claim, the Court will initially review the legal standards which govern a claim of retaliation under Ohio law.

Retaliation is made unlawful by § 4112.02(I) of the Ohio Revised Code, which provides:

> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Thus, as with the anti-retaliation provision in Title VII, § 4112.02(I) contains both an opposition clause and a participation clause.  Coch v. Gem Industries, 2005 WL 1414454 (Ohio App. 2005) at *5.[26]

_____

[26]As is indicated above, Ohio courts will apply decisions by federal courts construing Title VII, when construing Chapter 4112.  In Coch, the court applied that principle in the context of a claim under the anti-retaliation provision of the Ohio statute.  Accord Motley v. Ohio Civil Rights Comm., 2008 WL 2026426 (Ohio App. 2008).

In order to establish a prima facie case of retaliation in violation of Chapter 4112, a plaintiff must establish the following four factors: 1) she engaged in a protected activity; 2) the defendant was aware that she had engaged in that activity; 3) thereafter the defendant took an adverse employment action against her; and 4) the existence of a causal connection between the protected activity and the adverse employment action.  See e.g., Greer-Burger v. Temsi, 116 Ohio St.3d 324, 327, 879 N.E.2d 174, 180 (2007); Lynch v. Studebaker, 2007 WL 2269470 at *3 (Ohio App. 2007); Hall v. Banc One Management Corp., 2006 WL 465109 (Ohio App. 2006), reversed on other grounds, 114 Ohio St.3d 484, 873 N.E.2d 290 (2007).  In determining whether the defendant has taken an adverse employment action, the Ohio Supreme Court has applied to retaliation claims arising under Chapter 4112 the definition of adverse employment action in retaliation actions under Title VII, established by the United States Supreme Court in Burlington Northern & Santa Fe Railway Co v. White, 548 U.S. 53 (2006). Greer-Burger, 116 Ohio St.3d at 327 n. 2, 879 N.E.2d at 180 n. 2.  In Burlington Northern, the United States Supreme Court held that, in order to show that she suffered an adverse employment action in a retaliation action under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548 U.S. at 68 (internal quotation marks and citation omitted).

In Proctor v. Ohio Civil Rights Comm., 169 Ohio App.3d 527, 863 N.E.2d 1069 (2006), the court explained:

> When a prima facie showing of … retaliation is made, the burden shifts to the employer to show a nondiscriminatory reason for the action.  Hood v.

Diamond Prod., Inc. (1996), 74 Ohio St.3d 298, 302, 658 N.E.2d 738;
Chandler v. Empire Chem., Inc. (1994), 99 Ohio App.3d 396, 400, 650
N.E.2d 950.  If the employer makes this showing, the burden shifts back to
the employee to show that the nondiscriminatory reason was a mere pretext.
Hood, 74 Ohio St.3d at 302, 658 N.E.2d 738; Chandler, 99 Ohio App.3d at
400, 650 N.E.2d 950.

Id. at 532, 863 N.E.2d at 1073.

The Defendants argue that they are entitled to summary judgment on the

Plaintiff's claim of retaliation, because the evidence fails to raise a genuine issue of

material fact concerning two elements of a prima facie case of retaliation, to wit:

that she engaged in protected activity and that those who decided not to select

Plaintiff for one of the AC positions knew that she had engaged in such protected

activity, before they made that decision.  Although the Plaintiff has mentioned her

retaliation claim in her memorandum opposing Defendants' request for summary

judgment (see Doc. #38 at 43-45), she has not addressed either of the arguments

presented by the Defendants.  For reasons which follow, this Court concludes that

the evidence fails to raise a genuine issue of material fact as to whether Plaintiff

engaged in protected activity when she complained to Pinsky about unfair

treatment.  Therefore, it is not necessary to address Defendants' alternative

argument that the decisionmakers were unaware of her complaint.

In support of their argument that Plaintiff cannot establish a prima facie case

of retaliation, since she did not engage protected activity when she complained to

Pinsky about unfair treatment, the Defendants initially assert that this Court must

decide whether she engaged in such activity by applying the opposition clause,

rather than the participation clause.  In Coch, the Ohio appellate court discussed

when courts should apply the opposition clause, rather than the participation

clause:

> While the participation clause accords "exceptionally broad protection" to persons who have "participated in any manner," the opposition clause does not protect all "opposition activity."  [Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1312 (6th Cir. 1989)]; see also, Holden v. Owens-Illinois, Inc., 793 F.2d 745, 751 (6th Cir. 1986).
>
> To determine whether an activity engaged in by the employee falls within the "participation" clause or the "opposition" clause requires a literal reading of the statute.  [Booker, 879 F.2d at 1313].  As stated above, R.C. 4112.02(I) provides protection to an employee who "participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."  (Emphasis added.)  Thus, a prerequisite to protection under the participation clause is the initiation of formal proceedings leading to the filing of a complaint or a charge; if the activity engaged in by the employee occurs prior to the initiation of statutory proceedings it is to be considered pursuant to the opposition clause.  See id.

2005 WL 1414454 at *5.  Herein, this Court agrees with the Defendants that

Plaintiff's retaliation claim must be assessed under the opposition clause, given

that Plaintiff had not initiated formal proceedings before she was denied one of the

AC positions.

Defendants also argue that the Plaintiff did not engage in protected activity

under the opposition clause.  The Coch court also described what was necessary

to establish that a plaintiff's activity comes within that clause in the anti-retaliation

provision of the Ohio statute:

> "In order to engage in a protected opposition activity … a plaintiff must make an overt stand against suspected illegal discriminatory action."  Comiskey v. Automotive Industry Action Group (E.D.Mich. 1999), 40 F. Supp.2d 877, 898; see also Jackson v. Champion Natl. Bank & Trust Co. (Sept. 26, 2000), 10th Dist. No. 00AP-170.  Vague charges of discrimination do not invoke the protection of the law.  Booker, supra, at 1313.  In addition, "[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are [likewise] insufficient to

constitute protected activity." Weaver v. Ohio State Univ. (S.D.Ohio 1998), 71 F. Supp.2d 789, 793-94.

Id. In Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989), the Sixth Circuit held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." Id. at 1313. Similarly, in Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995), the Third Circuit held that plaintiff's letter to defendant's human resources department, complaining generally about unfair treatment and expressing his dissatisfaction with the fact that someone else was awarded the position to which he had sought a promotion did not constitute protected opposition to discrimination, because he did not specifically complain about discrimination. See also Fox v. Eagle Distributing Co., Inc., 510 F.3d 587 (6th Cir. 2007) (holding that plaintiff's conversation with customer, in which he stated that he was suing defendant and two of his supervisors for millions of dollars and expressed his disappointment about not being promoted, did not constitute protected activity under the opposition clause, because he did not mention discrimination).

Herein, the Plaintiff testified during her deposition that she had complained to Pinsky about being treated unfairly. Plaintiff's Dep. at 156. She also testified that she did not inform Pinsky that she was being treated unfairly because of her race or gender. Id. at 156-57. In accordance with the decisions discussed above, this Court concludes that the Plaintiff's general complaint of unfair treatment, in which she did not contend that she had been discriminated against on the basis of

her race or her gender, did not constitute protected activity under the opposition clause of § 4112.02(I).

Accordingly, this Court sustains the Defendants' Motion for Summary Judgment (Doc. #25), as it relates to Plaintiff's claim of retaliation in violation of Chapter 4112 of the Ohio Revised Code, the Sixth Claim for Relief in her Complaint (Doc. #1).

Based upon the foregoing, the Court sustains the Defendants' Motion for Summary Judgment (Doc. #25), as to all claims set forth in Plaintiff's Complaint (Doc. #1).  Judgment is to be entered in favor of Defendants and against Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

July 25, 2008

                              /s/ Walter Herbert Rice
                         _____
                              WALTER HERBERT RICE, JUDGE
                              UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.